IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *EX REL.* DEBORAH RADKE, AS RELATOR UNDER THE FALSE CLAIMS ACT, | ) ) ) ) | |
| Relator/Plaintiff, | ) | Case No. 1:12-cv-06238 |
| v. | ) ) | Honorable Sharon Johnson Coleman |
| SINHA CLINIC CORP., BABER AND ASSOCIATES, LLC, SHOBA SINHA, M.D., and SABRINA YOUNG, PH.D., PSY.D., | ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANT SINHA'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

Defendants, Sinha Clinic S.C. ("Sinha Clinic"), incorrectly sued as Sinha Clinic Corp., and Shobha Sinha, M.D. ("Dr. Sinha"), (whenever appropriate, the Sinha Clinic and Dr. Sinha shall be referred to collectively herein as "Sinha"), by and through their attorneys, David J. Tecson and Ryan A. Haas of Chuhak & Tecson, P.C., file this Memorandum of Law in Support of Motion to Dismiss pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, and in support hereof, states as follows:

### I.  INTRODUCTION

The Complaint filed by Deborah Radke ("Radke" or "Plaintiff") against Sinha suffers from multiple flaws which require dismissal with prejudice pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. The Complaint and Exhibits comprise 355 pages of allegations and medical necessity opinions (Doc. #2). These allegations fail to allege a recognized cause of action for the following reasons:

- The medical services provided at the Sinha Clinic are not "designated health services" as defined by the Stark regulatory framework and, therefore, the referral of these services cannot be a Stark violation;

- Plaintiff wrongfully conglomerates the alleged liability of all Defendants in Counts I, II, III, IV and V in violation of the fraud pleading requirements described in Rule 9(b);

- The Complaint fails to allege that the ICFPA sections of the Complaint were submitted to the State's Attorney or the Illinois Attorney General; and

- In sum, the lengthy pleading fails to assert any valid basis for the FCA claims against the Sinha Clinic and Dr. Sinha.

## II. SUMMARY OF ALLEGATIONS OF THE COMPLAINT

The Sinha Clinic is a mental health practice which specializes in "EEG neurofeedback and psychotherapy" (Doc. #2, ¶7).[1] The Sinha Clinic is located in St. Charles, Illinois and Dr. Sinha owns the Sinha Clinic (*Id.*, ¶8). The Baber Clinic ("Baber") is a mental health practice which specializes in clinical psychology and psychiatry located in Naperville, Illinois (*Id.*, ¶10). Dr. Sinha is a part owner of Baber (*Id.*, ¶11).

Plaintiff worked as an office manager for the Sinha Clinic from approximately February 2010 through the date of the filing of the Complaint, August 8, 2012 (¶12). Plaintiff also worked as an office manager for Baber beginning in or about August of 2001 through an unalleged date (*Id.*).

---

[1] Hereinafter, Doc. #2, the Complaint, will be cited by the relevant paragraph number only.

Dr. Sinha referred patients she treated at Baber to the Sinha Clinic and, thereafter, according to the Complaint, the claims for these patients were submitted to Blue Cross Blue Shield ("BCBS"), Medicare and private insurers (¶¶54-56).

*Two Evaluations of the Same Patient*

The Complaint alleges that it was medically unnecessary for Dr. Sinha (a physician) and Sabrina Young, Ph.D. (a psychologist), hereinafter referred to as "Dr. Young," to both conduct evaluations of the same patient (¶¶55-65).

*Biofeedback or Neurofeedback Procedures at Sinha Clinic*

The Complaint alleges that neurofeedback procedures are sometimes referred to as "biofeedback procedures." Biofeedback is only covered by Medicare under "very limited circumstances" (¶92). Blue Cross Blue Shield ("BCBS") and other private insurers do not cover biofeedback according to the Complaint (¶93). "Defendant Physicians" utilized CPT codes 90804, 90806, 90810 and 90814 for neurofeedback procedures provided to patients and also instructed interns and office staff to bill neurofeedback as psychotherapy services for neurofeedback procedures which were "actually performed" (¶97, 104). As part of her duties as office manager for the Sinha Clinic, the Plaintiff "finalized the improper claims for submission to RelayHealth (which in turn transmitted those claims to Medicare and private insurance companies)" (¶101).

*Defendant Physicians Improperly Billed for Psychological Testing*

According to the Complaint, Dr. Young and Dr. Sinha instructed office staff to enter the maximum amount of reimbursable units of testing for CPT code 96118 which is generally described as neuropsychological testing (¶116). CPT code 96118 applies to "neuropsychological testing, per hour of the psychologist's or physician's time, both face-to-face time administering tests to the patients and time interpreting these test results in preparing a report." According to

- 3 -

Plaintiff, Dr. Young entered notes on certain patient charts indicating that nine units should be billed for "neuropsych battery" for "Medicare only," and that twenty units should be billed for a "neuropsych battery" for "all insurance except Medicare" (¶118).

*Defendant Physicians Improperly Supervised Interns and Staff*

The Sinha Clinic utilized student interns from the Adler School of Professional Psychology and the Chicago School of Professional Psychology to work in the Sinha Clinic (¶126). Medicare and private insurers will reimburse for (1) psychological testing, (2) therapy, and/or (3) a quantitative electroencephalograph (QEEG) followed by neurofeedback sessions (¶128). Medicare and private insurers will reimburse for the procedures described above conducted by "non-licensed practitioners and interns" so long as they are "under the supervision of a licensed provider." According to the Complaint, the Sinha Clinic improperly billed Medicare and private payors because interns performed procedures on patients without proper supervision from Dr. Young or Dr. Sinha (¶¶132-139).

The Complaint also alleges that Sinha Clinic staff members "performed QEEG procedures on patients, conducted the interpretations of these QEEGs, and drafted reports" (¶¶143-146). Specifically, the Complaint alleges that Erik Hejnosz performed QEEG procedures on or about April 24, 2012 and thereafter "Two false claims were billed to a private insurer" (¶150). The Complaint also alleges that QEEG procedures were performed by Sinha Clinic staff members on or about January 17, 2012, May 1, 2012, May 10, 2012, May 17, 2012 and May 22, 2012 (¶¶151-156). These alleged improper claims described in ¶¶151-156 were billed to "a private insurer" under Dr. Young's NPI number (*Id.*).

### III.     ARGUMENT

Plaintiff's Complaint is vulnerable to a motion to dismiss because the allegations against Sinha fail to state a claim for which relief can be granted pursuant to Rule 12(b)(6). In addition,

- 4 -

Plaintiff's Complaint against Dr. Sinha and the Sinha Clinic fails to allege violations of the FCA and/or violations of the IFCPA with the specificity required by Rule 9(b) (FRCVP 9(b)).

> **A.  Dr. Sinha did not refer patients from the Baber Clinic to the Sinha Clinic in Violation of Stark**

The most glaring flaw which undermines Plaintiff's Complaint against Sinha arises out of the Plaintiff's failure to allege that Dr. Sinha referred patients from Baber to the Sinha Clinic for designated health services ("DHS") payable by Medicare. Assuming, for the moment, that the allegations of the Complaint are true, Dr. Sinha's referral of patients from Baber to the Sinha Clinic for mental health services did not violate the FCA. To the contrary, all of Dr. Sinha's actions in referring patients between Baber located in Naperville and the Sinha Clinic located in St. Charles were legal.

Section 1877 of the Social Security Act (42 U.S.C. § 1395nn), also known as the physician self-referral law and commonly referred to as "Stark," prohibits a physician from making referrals for certain designated health services ("DHS") payable by Medicare to an entity with which he or she (or an immediate family member) has a financial relationship (ownership, investment, or compensation), unless an exception applies.

A referral is defined under Stark (42 C.F.R. § 411.351) as the following:

"Referral--

(1) Means either of the following:

> (i) Except as provided in paragraph (2) of this definition, **the request by a physician for, or ordering of, or the certifying or recertifying of the need for, <u>any designated health service</u> for which payment may be made under Medicare Part B**, including a request for a consultation with another physician and any test or procedure ordered by or to be performed by (or under the supervision of) that other physician, but not including any designated health service personally performed or provided by the referring physician. A designated health service is not personally performed or provided by the referring physician if it is performed or provided by any other person, including, but not limited to, the referring

physician's employees, independent contractors, or group practice members" (emphasis added).

Section 411.351 defines designated health services (DHS) as follows:

"any of the following services (other than those provided as emergency physician services furnished outside of the U.S.), as they are defined in this section:

(1)     (i)     **Clinical laboratory services**.
         (ii)     Physical therapy, occupational therapy, and outpatient speech-language pathology services.
         (iii)     Radiology and certain other imaging services.
         (iv)     Radiation therapy services and supplies.
         (v)     Durable medical equipment and supplies.
         (vi)     Parenteral and enteral nutrients, equipment, and supplies.
         (vii)     Prosthetics, orthotics, and prosthetic devices and supplies.
         (viii)     Home health services.
         (ix)     Outpatient prescription drugs.
         (x)     Inpatient and outpatient hospital services.

(2)     Except as otherwise noted in this subpart, the term "designated health services" or DHS means only DHS payable, in whole or in part, by Medicare. DHS do not include services that are reimbursed by Medicare as part of a composite rate (for example, SNF Part A payments or ASC services identified at § 416.164(a)), except to the extent that services listed in paragraphs (1)(i) through (1)(x) of this definition are themselves payable through a composite rate (for example, all services provided as home health services or inpatient and outpatient hospital services are DHS)" (emphasis added).

The Court's analysis of Plaintiff's claims against Sinha for Stark violations could end here. However, to remove any doubt regarding the feeble nature of these allegations, a review of the relevant data on the CMS website confirms that the mental health services offered by the Sinha Clinic do not fall within the definition of clinical laboratory services.

Section 411.351 defines "clinical laboratory services" as follows:

"the biological, microbiological, serological, chemical, immunohematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings, including procedures to determine, measure, or otherwise describe the presence or absence of various substances or organisms in the body, **as specifically identified by the List of CPT/HCPCS Codes**. All services so identified on the List of CPT/HCPCS Codes are clinical

- 6 -

laboratory services for purposes of this subpart. **Any service not specifically identified as a clinical laboratory service on the List of CPT/HCPCS Codes is not a clinical laboratory service for purposes of this subpart**."

The list of CPT/HCPS Codes is available on the CMS website.[2] For the Court's convenience, attached hereto are copies of the lists of CPT/HCPS codes identified on the CMS website, effective January 1, 2012 and January 1, 2015 (Exhibits 1 and 2). The Complaint fails to allege which particular services were provided in violation of Stark. There are various references to CPT codes throughout the Complaint, including CPT codes 90801 (¶64), 90804, 90806, 90808, 90810, 90814 (¶¶69, 100), 90901 to 90911 (¶89), 95962, 96961 (¶145), 96118 (¶158). However, none of these codes are included on the list of CPT/HCPS codes, and as such, are also not considered DHS pursuant to Section 411.351.

> **B.     Plaintiff was Required to Submit the ICFPA Counts to the State's Attorney or the Illinois Attorney General**

Paragraph 2 of the Complaint alleges that the Plaintiff asserts this action on behalf of the State of Illinois (¶2). However, the Complaint does not indicate that the ICFPA counts have been submitted to the State's Attorney or the Illinois Attorney General as required by Section 15 of the ICFPA, which provides, in pertinent part, as follows:

> § 15. Action by interested person.
>
> (a) An interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois. The action shall be brought in the name of the State. The action may be dismissed only if the court and the State's Attorney or the Attorney General, whichever is participating, gives written consent to the dismissal stating their reasons for consenting.
>
> (b) A copy of the complaint and a written disclosure of substantially all material evidence and information the person possesses shall be served on the State's Attorney and Attorney General. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be

---

[2] Available here: http://www.cms.gov/Medicare/Fraud-and-Abuse/PhysicianSelfReferral/List_of_Codes.html.

2604801\1\23359\56381

> served on the defendant until the court so orders. The State's Attorney or Attorney General may elect to intervene and proceed with the action within 60 days after he or she receives both the complaint and the material evidence and information. If more than one governmental entity elects to intervene, the State's Attorney shall have precedence.

> 740 ILCS 92/15(a) and (b).

If Plaintiff has failed to submit Counts IV and V of the Complaint to the State's Attorney and the Illinois Attorney General, then the State of Illinois has been deprived of the opportunity to prosecute and/or intervene in the action. If the Plaintiff has followed the correct procedural steps, the State's Attorney or Attorney General must have the opportunity to prosecute the action, remain as a party to the action, or "settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances" (740 ILCS 92/20(b)). The Plaintiff will not possess standing to prosecute this action until after the State's Attorney and/or Attorney General has decided the correct course of action.

The prohibitions of the FCA only encompass bills submitted to Medicare in the healthcare context. If the Plaintiff has not complied with the procedural steps required by the ICFPA, then all allegations associated with billing submitted to private payors should be stricken from the Complaint, and Counts IV and V of the Complaint should be dismissed with prejudice.

### C. The Complaint Fails to Properly Allege Violation of the False Claims Act

For at least the last decade, the Seventh Circuit has recognized the plaintiff's burden of compliance with Rule 9(b) of the Federal Rules of Civil Procedure when asserting the *qui tam* provision of the FCA. *U.S. ex rel Gross v. Aids Research Alliance*, 415 F.3d 601 (7th Cir. 2005). In the *Gross* case, the Seventh Circuit described the pleading standard for FCA claims as follows:

> The FCA is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir.2003) (Rule 9(b) applies "because the False Claims Act condemns fraud but not negligent errors or omissions.") As is pertinent here, the FCA imposes liability against any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). An FCA claim under § 3729(a)(2) has three essential elements: (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false. 31 U.S.C. § 3729(a)(2); Lamers, 168 F.3d at 1018.
>
> *Gross,* 415 F.3d 601 (7th Cir. 2005).

The Complaint contains a variety of allegations which the Plaintiff characterizes as violations of the FCA. These include the provision of two evaluations for the same patient (by Dr. Sinha and Dr. Young), billing for neurofeedback procedures utilizing codes 90804, 90806, 90810 and 90814, improperly billing Medicare for 9 units of neuropsychological testing, and also improperly billing for psychiatric and/or psychological care provided by student interns who were not properly supervised. The Complaint fails to allege with any particularity that Dr. Sinha knew that the Sinha Clinic submitted false billing to Medicare.

The Complaint drifts back and forth between allegations directed at "Defendant Physicians"[3] and allegations directed at individuals. It is not always clear from the Complaint whether the billing was submitted to Medicare or private insurers. For example, Paragraphs 150 through 158 relate to alleged improper billing submitted to private payors, which could not violate the FCA.

---

[3] Paragraph 31 of the Complaint defines "Defendant Physicians" as both Dr. Sinha and Dr. Young.

- 9 -

FCA plaintiffs are required to satisfy the "who, what, when, where and how" requirement for pleading fraud pursuant to Rule 9(b). *Gross v. Aids Research Alliance*, 415 F.3d at 605; *U.S. ex rel Garst v. Lockheed Martin*, 328 F.3d 374, 376.

The Plaintiff's frequent use of the term "Defendant Physicians" muddies the waters with respect to whether the Sinha Clinic and/or Dr. Sinha ever knowingly submitted a false claim to the government for payment. Plaintiff also comingles incorrect medical necessity opinions in an unsuccessful attempt to assert fraud.

Paragraphs 59-67 assert that "Defendant Physicians" engaged in Medicare fraud because both Dr. Sinha and Dr. Young performed evaluations of the same patient. The Plaintiff office manager alleges that "evaluations should have only been performed once for each patient and were only necessary to be performed once" (¶60). Plaintiff's opinion is contrary to CMS Guidelines regarding diagnostic interview examinations, which provide as follows: "It may be utilized multiple times in the same patient if a new episode of illness occurs or when reevaluation is required in order to address a new referral question" (CMS Guidelines: 90801). There is no allegation specific to Dr. Sinha which indicates she knew the Sinha Clinic was submitting a false bill to Medicare for payment merely because the patient received more than one diagnostic interview examination.

Plaintiff mistakenly alleges that "neurofeedback services" are synonymous with "biofeedback services" billed under CPT codes 90901 and 90911 (¶89). The neurofeedback sessions offered to patients at the Sinha Clinic have been widely recognized by peer reviewed medical journals as effective treatment for a variety of psychological disorders. Moriyama, T. S., Polanczyk, G., et al. (2012). Evidence-Based Information on the Clinical Use of Neurofeedback for ADHD. *Neurotherapeutics*, 9(3), 588-98; Nan, W., Rodrigues, J., et al.

- 10 -

(2012). Individual alpha neurofeedback training effect on short term memory. *International Journal of Psychophysiology*, 86(1), 83-87; Nelson, D., Esty, M. (2012 Neurotherapy of Traumatic Brain Injury/Posttraumatic Stress Symptoms in OEF/OIF Veterans. *Journal of Neuropsychiatry and Clinical Neurosciences*, 24(2), 237- 240; Lofthouse, N., Arnold, L. (2012). A Review of Neurofeedback Treatment for Pediatric ADHD. *Journal of Attention Disorders*, 16(5), 351-372 (attached hereto as Exhibit 3).

Biofeedback and neurofeedback ("NF") are related but different types of medical treatment. Biofeedback generally involves the measure of heart rate, blood pressure and muscle attention in an effort to treat certain cardiovascular symptoms. Neurofeedback measures the brain's electrical activity by placing electrodes that are used to help change brain wave activity. These changes are evaluated by a device called Electroencephalography (Brain Mapping). It addresses particular mental illnesses such as ADHD, Obsessive Compulsive Disorder, Generalized Anxiety Disorder, Post-traumatic Stress Disorder, Depression and Addictive Disorders. It has also been effective in treatment for Seizure Disorders and learning Disabilities. Frank Duffy, M.D., Neurologist, Head of Neuroimaging Department and Research at Boston's Children's Hospital and Harvard School Professor, conducted an independent review of the literature on Neurofeedback for Clinical Electroencephalography (2000) and his findings were as follows: The literature which lacks any negative study of substance, suggests that EEG Biofeedback/Neurofeedback therapy should play a major therapeutic role in many different areas.

The inter-relationship between neurofeedback and the related concept of biofeedback has been described as follows:

> NF, formerly called electroencephalographic biofeedback and occasionally referred to as neurotherapy, extends to the training of the

> brain's electrical activity the biofeedback concepts, strategies, and techniques previously established as useful in some medical disorders, especially cardiovascular. Both bio- and NF are thought to work via the classical/operant conditioning mechanisms of learning that train the body/brain to improve its regulation of itself by providing it with real-time video/audio/tactile information about its electrical activity measured from electrodes placed on the surface of the body (biofeedback) or head (NF).

*Journal of Attention Disorders*, 16(5), 352.

This section of the Complaint apparently arises out of the Plaintiff's opinion that the neurofeedback treatment provided to Sinha Clinic patients should have been coded as biofeedback, as opposed to a different code such as CPT code 90810 which includes interactive psychotherapy involving physical devices or other mechanisms of non-verbal communication. Nonetheless, Plaintiff concedes and alleges that biofeedback is covered by Medicare under some circumstances (¶92), and she cites a policy from Blue Cross Blue Shield of Tennessee to support her allegation that biofeedback is not covered by Blue Cross (¶93). These allegations are contorted at best. Most importantly, the Complaint is devoid of an allegation that Dr. Sinha or the Sinha Clinic intentionally sent a false or misleading bill to a private payor such as Blue Cross Blue Shield of Tennessee.

In an effort to transform her coding opinion into a claim for fraud, Plaintiff alleges that "Defendant Physicians" instructed her to submit claims for allegedly covered psychotherapy services under codes such as 90814 ("individual therapy) and CPT code 90810 (which includes billing for interactive psychotherapy which might include 'physical devises,' or other mechanisms of non-verbal communication"). Paragraphs 104-111 of the Complaint allege that the Sinha Clinic utilized the wrong codes for neurofeedback procedures. Once again, this section of the Complaint alleges that "Defendant Physicians" knew they were engaging in illegal and fraudulent practices. Plaintiff's opinion that neurofeedback services should have utilized a

- 12 -

different code does not amount to an allegation of fraud wherein she is required to plead that the Defendants, such as Dr. Sinha, knew that she was submitting a false claim to the government for payment. In this instance, Plaintiff alleges that the services were provided to the patient and her opinion that the treatment should have been coded differently does not amount to a fraud allegation which satisfies the high standard for FCA claims pursuant to Rule 9(b).

In another section of the Complaint, Plaintiff alleges that CPT code 96118 applies to "neuropsychological testing, per hour of the psychologist's or physician's time, both face-to-face administering tests to the patient and interpreting these test results and preparing a report." The Complaint also alleges that Medicare covers nine units of testing for this service provided by the physician or psychologist (¶115). Thereafter, the Plaintiff alleges that Dr. Young entered notes instructing her to bill Medicare for nine units, which was the maximum amount payable by Medicare. Plaintiff then adroitly alleges again that "Defendant Physicians," billed for the maximum amount of testing "when in fact less was done" (¶119).

In crafting her Complaint, Plaintiff neglected to address the definition of CPT code 96118, which allows the psychologist or physician to bill for "both face-to-face time administering tests to the patients and time interpreting these test results and preparing a report." Plaintiff's Complaint in this section is founded on "the amount of testing units." She has no personal knowledge and has made no allegations associated with the amount of time that Dr. Young and/or Dr. Sinha spent "interpreting the test results and preparing a report." There is nothing in the Complaint which indicates that Dr. Sinha knowingly submitted a false bill for nine time units associated with the administration of neuropsychological testing, the time spent interpreting test results, and preparing a report in compliance with CPT code 96118.

Paragraphs 126-139 generally allege that the "Defendant Physicians" failed to provide proper supervision to student interns from the Adler School of Professional Psychology and the Chicago School of Professional Psychology when performing diagnostic evaluations for patients. The Complaint again fails to allege that the Sinha Clinic and/or Dr. Sinha were aware of any improper billing submitted to Medicare. The Complaint alleges only that there were occasions wherein Dr. Sinha and/or Dr. Young were not present in the Clinic when student interns were providing evaluations to patients. Assuming this allegation is true, this falls far short of alleging that Dr. Sinha and/or the Sinha Clinic were aware that improper bills had been submitted to Medicare. The Complaint only vaguely alleges that "Defendant Physicians" had specific knowledge of illegal and fraudulent transactions, which is not sufficient to satisfy the pleading standard required for an FCA complaint.

Paragraphs 140-149 contain the same defect. By way of summary, these paragraphs allege that staff members Crystal Norton and Erik Hejnosz performed clinical psychological services and billed for such services "under Dr. Young's NPI number" (¶143). Other than vague allegations regarding instructions from "Defendants" and "Defendant Physicians," there is nothing in this section of the Complaint which alleges that Dr. Sinha and/or the Sinha Clinic knew that improper billing had been submitted to Medicare. Setting aside, for the moment, whether it would be improper for a staff member to conduct a QEEG test on a patient, which would yield results later interpreted and utilized by Dr. Sinha or Dr. Young, there is certainly nothing in this Complaint which satisfies the pleading requirements for an FCA case.

As recited above, paragraphs 150-156 of the Complaint all relate to "false claims billed to a private insurer," and therefore, this alleged improper billing does not implicate the FCA. Once again, this section of the Complaint fails to allege that Dr. Sinha and/or the Sinha Clinic had any

- 15 -

knowledge of improper billing aside from the boilerplate reference to "Defendant Physicians." Lastly, paragraphs 157-160 contain the same fatal flaw wherein the Complaint alleges failure to supervise interns at the Clinic and, based on "Defendant's instructions" improper bills were submitted to an unknown payor.

WHEREFORE, certain Defendants, Sinha Clinic, S.C. and Shobha Sinha, M.D., respectfully request dismissal of this action with prejudice, and also seek an award of their attorneys' fees and defense costs associated with this case while the Court grants all other relief which is just and equitable.

DATED: February 20, 2015

    Respectfully Submitted,

    SINHA CLINIC, S.C. and SHOBHA SINHA, M.D.

    By:    s/ David J. Tecson
        One of His Attorneys

David J. Tecson (6198108)
Ryan A. Haas (6283020)
CHUHAK & TECSON, P.C.
30 S. Wacker Drive, Suite 2600
Chicago, IL 60606
(312) 444-9300

2604801\1\23359\56381