### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA RADKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No. 12 CV 06238** |
| | ) | |
| | ) | |
| | ) | |
| SINHA CLINIC, et. al., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff/Relator, Debra Radke, on behalf of the United States and under the Federal False Claims Act, and by and through her undersigned counsel, states as follows as her First Amended Complaint against Defendants Sinha Clinic ("Clinic"), Dr. Shoba Sinha ("Dr. Sinha"), Sabrina Young ("Young"), and Baber & Associates, LLC ("Baber"):

## INTRODUCTON

1.     This is a whistleblower action to recover damages and civil penalties on behalf of the United States for violations of the False Claims Act, 31 U.S.C. §§3729, *et. seq.* ("FCA"), and for violations of the FCA through violations of the Stark Law, 42 U.S.C. § 1395nn.

2.     The Clinic is a mental health practice that purports to specialize in EEG neurofeedback.  Patients referred to the Clinic are supposed to receive any number of services, including evaluations, psychological testing, psychotherapy services, brain-mapping, and neurofeedback services.

3.     Relator was employed as an Office Manager at the Clinic. She possesses direct and independent first-hand personal knowledge of the allegations of this Amended Complaint. As personally observed by the Relator, Defendants for many years systematically, knowingly, recklessly, and illegally caused to be submitted to the United States materially false records and claims relating to the alleged services provided at the Clinic in order to get false claims paid.

4.     In short, Defendants employed fraudulent schemes to improperly and illegally bill Medicare for uncovered, duplicative and unnecessary procedures, including claims that were the product of fraudulent self-referral; claims for psychotherapy services and testing that were never actually provided to patients; claims for services that were not covered at all by Medicare; and claims for procedures that were performed by wholly unsupervised and unlicensed interns and office staff but billed under Defendants' NPI numbers.

5.     As a direct and foreseeable result of the Defendants' improper and illegal practices, federal health insurance programs were materially impacted and financially damaged.

**<u>PARTIES</u>**

6.     Defendant, Sinha Clinic Corp. (the "Clinic"), at all relevant times was an Illinois corporation. The Clinic purported to be a mental health practice that specialized in EEG Neurofeedback and psychotherapy. At all relevant time, the Clinic's staff included a licensed physician, a licensed clinical psychologist, and numerous other office staff Interns, primarily from the Adler School of Professional Psychology and the Chicago School of Professional Psychology, who also worked at the Clinic for school credit. At all relevant times, the Clinic was located at 2560 Foxfield Road, # 240, in Saint Charles, Illinois.

7.      Defendant Shoba Sinha, M.D., is a resident of the State of Illinois who at all relevant times was board certified to practice medicine in the field of psychiatry.  At all relevant times, Dr. Sinha was an owner of the Clinic.

8.      Defendant Sabrina Young, Psy. D, is a resident of the State of Illinois who at all relevant times was a licensed clinical psychologist.  At all relevant times, Dr. Young was an employee of the Clinic.  It is unclear whether Young continues to work or practice in this field.

9.      Defendant, Baber and Associates, LLC ("Baber"), is an Illinois limited liability company.  At all relevant times, Baber purported to be a mental health practice that allegedly specialized in clinical psychology and psychiatry.  At all relevant times, Baber was located at 1460 Bond Street, Suite 130, in Naperville, Illinois.

10.      At all relevant times, Dr. Sinha was also an owner of Baber.

11.      Plaintiff/Relator Deborah Radke ("the Relator") was formerly a resident of Ottawa, Illinois, who now resides outside the State of Illinois.  The Relator worked as the Office Manager for the Defendant Clinic for several years, beginning in approximately February 2010.  Prior to that time, and beginning in or about August 2001, the Relator worked as an Office Manager for Baber.  At all relevant times, the Relator had responsibility for, and possessed intimate familiarity with, the business practices and procedures of the Dr. Sinha, Young, and the Clinic, as well as to a lesser degree that of Baber.  Relator's intimate and first-hand knowledge includes the allegations set forth herein, including but not limited to the billing practices at both the Clinic and Baber.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

13.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a), which provides that an action under 3730 may be bought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business -- or in which any act proscribed in 3729 occurred.  At all relevant times, each of the Defendants, resided in and transacted business in this District and the fraudulent acts committed by them occurred within this District.

14.     Venue lies in this District pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §§1391 (b) and 1391(c) because, at all relevant times, Defendants were (and are still believed to be) located within this District, conducted business within this District, and because all or substantially all of the acts complained of herein took place within this District.

15.     The matters alleged herein were not been publicly disclosed prior to the filing of the Relator's original Complaint in this action.  In any event, the Relator is and has always been the original source of the allegations contained within this lawsuit.

16.     Relator satisfied and exhausted all procedural requirements prior to, and in connection with, her original filing of this action, including but not limited to  providing the Government with her material disclosures in strict compliance with the statute, and meeting with with the Government's lawyers, among other activities.

**BRIEF BACKGROUND ON THE MEDICARE PROGRAM**

17.     The Medicare program, established under the Social Security Act of 1965, provides medical services, equipment, and supplies to the aged, blind and disabled.  In addition, Medicare Part B is a federally funded supplemental insurance program that provides insurance benefits only to those who are eligible.

18.     The Centers for Medicare and Medicaid Services ("CMS") administers and supervises the Medicare Program on behalf of the United States government.

19.     For purposes of Medicare and Medicaid rules and regulations, a "Provider" is a health professional or organization that is enrolled with Medicare/CMS and provides health services to eligible Medicare beneficiaries.

20.     Providers seeking reimbursement from Medicare for services provided to Medicare beneficiaries must have: 1) a National Provider Identification ("NPI") Number; and 2) must be enrolled with Medicare as Providers.

21.     Medicare provides internet and paper based manuals available to Providers that include day-to-day operating instructions, policies and procedures based on statutes and regulations, guidelines, models and directives.  In addition, from time to time, each Medicare Provider is furnished with information regarding Medicare's rules for the billing of services.

22.     Under the Health Insurance Portability and Accountability Act ("HIPAA"), CMS was required to adopt standards for a uniform coding system for reporting and billing health care transactions.  In response, CMS established the Healthcare Common Procedure Coding System ("HCPCS"), which is divided into two subsystems: Level I and Level II.  *See* 45 C.F.R. §§162.1002, 162.1011.  Level I is comprised of Current Procedural Terminology ("CPT").  The CPT is a uniform coding system established and maintained by the American Medical

Association. It consists of descriptive terms and identifying codes that are used primarily to identify medical services and supplies furnished by physicians and other health care professionals. Level II is a standardized system used to identify products, supplies and services not included in the CPT, when used outside a physician's office.

23. The claim form submitted to Medicare by the Medicare Provider for reimbursement of medical claims is known as a "CMS-1500." This form requires the Provider to state the diagnosis of the patient's condition and provide a "HCPCS code" identifying the service(s) purportedly rendered by the Provider.

24. As an express condition of payment, Medicare requires that the Provider certify that the services rendered to a patient were medically necessary and actually furnished by the Provider. The Provider must also certify as to such matters as where the services were allegedly rendered and the date on which the services or procedures were performed.

25. Moreover, Providers participating in the Medicare program must agree in writing that they are responsible for the accuracy of all claims submitted by themselves, their employees and agents, and that all claims submitted under their provider numbers are accurate, complete and truthful.

26. Medicare requires that the Provider's signature be present on each claim form submitted by the Provider, the Provider's office, or the Provider's agent. By signing the claim form, the Provider expressly certifies that "the services were personally furnished by me or were furnished incident to my professional services by my employee under my immediate supervision, except as otherwise expressly permitted by Medicare."

27. Medicare also permits the submission of claims to be made electronically and permits Providers to use third-parties as their agents to submit such electronic claims.

28.     In the present case, at all relevant times and as set forth in detail below, the Defendant Clinic, Defendant Sinha, and Defendant Young submitted their electronic claims to Medicare through their authorized agents, RelayHealth Clearing House ("RelayHealth").  More specifically, each evening, all completed and approved claims were downloaded from the Clinic's electronic medical records system, "Medisoft," for processing and transmission by RelayHealth to Medicare.

29.     Medicare requires that Providers who submit claims, or cause claims to be submitted electronically, sign an Electronic Data Interchange Agreement Form ("EDIA"), in lieu of submitting CMS-1500.  The EDIA requires that the Provider submit claims on behalf of only those Medicare beneficiaries who have given their written authorization to do so and that the beneficiary's signature authorizing use of the electronic format be on file.  The EDIA further requires that the Provider ensure that every electronic claim is supported by an "original source document" containing the beneficiary's name, claim number, date(s) of service, diagnosis, and service performed.  This original source information must be kept on file for at least 6 years, and for 3 months after the bill has been paid.  Similar to the submission of a CMS-1500 form, pursuant to the EDIA, as an express condition of payment, with each electronic submission the Provider expressly certifies that the services were "performed as billed" and that the claims submitted are "accurate, complete, and truthful."  *See* CMS, Medicare Benefit Policy Manual, CMS Pub.  100- 04, Chap. 24, Section 20.1.1 (Rev. 1283, Issued: 07-06-07, Effective/Implementation: 10-01-07).

30.     At all relevant times, Defendant Sinha and Defendant Young signed all EDIA Forms.

## APPLICABLE LAW

### The Federal False Claims Act

31.     The Federal False Claims Act, 31 § follows:

    a.  Liability for Certain Acts—

        1.  IN GENERAL—Subject to paragraph (2), any person who—

        (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
        (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

        (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

        (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government;

        is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

        (3) COSTS OF CIVIL ACTIONS—A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

32.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the civil penalties applicable to the False Claims Act allegation in this case are not less than $5,500 and not more than $11,000 per false claim.  Upon a finding of liability, civil penalties are awarded for each false claim made, irrespective of whether each such claim actually caused harm to the Government.

33.     For purposes of the False Claims Act, the terms "knowing" and "knowingly" means that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

34.     Pursuant to Section 3730(d) of the False Claims Act, *qui tam* relators (as in this case, Relator Radke) are entitled to "receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs.  All such expenses, fees, and costs shall be awarded against the defendant."  See 31 U.S.C. § 3730(d)(1) & (2).

**The Stark Statue**

35.     Enacted as amendments to the Social Security Act, 42 U.S.C., § 1395nn (commonly known as the "Stark Statute"), expressly prohibits an entity providing healthcare items or services from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with that same entity.  The Regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. § 411.353.

36.     The Stark Statute establishes a clear rule that the United States will not pay for any items or services prescribed by physicians who have improper financial relationships with other providers.  The statute was designed specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services.

37.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider.  *See* Omnibus Reconciliation Act of 1989, P.L. 101-239, § 6204.

38.     In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services.  *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

39.     As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the "designated health services," which includes inpatient and outpatient hospital services.  See 42 U.S.C. § 1395rm(h)(6).

40.     In pertinent part, the Stark Statute provides:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then—

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

*See* 42 U.S.C. § 1395nn.  42.

41.     The Stark Statute broadly defines prohibited financial relationships to include an "ownership or investment interest" in the entity or any "compensation" paid directly or indirectly to a referring physician.  The statute's exceptions identify specific transactions that do not trigger

10

its referral and billing prohibitions.  None of the practices at issue in this Amended Complaint qualify for those Stark Law exemptions.

**Defendants' Illegal Self-Referral Scheme**

42.     As referenced above, at all relevant times Dr. Sinha was an owner of both the Clinic and Baber.  Accordingly, at all relevant times, Dr. Sinha has a financial relationship with both entities within the meaning of Stark.

43.     Defendant Dr. Sinha regularly violated Stark II by referring to the Clinic patients she saw and/or treated at the separate and distinct Baber clinic.

44.     Dr. Sinha's and Baber's violations of Stark II are readily identifiable in the records kept in the ordinary course of business by the Clinic and by Baber – many of which are in the possession of the Relator.

45.     For instance, when a new patient first called the Clinic to schedule an appointment or on the first visit, a Patient Intake Form was always completed.  Among other things, the referral source was regularly recorded on the Patient Intake Form.  In all instances where Dr. Sinha's name was listed on the Patient Intake Form form as the referral source, Dr. Sinha in fact actually, knowingly, intentionally, and personally referred each such patient as an owner of Baber, to the Clinic, where she was an owner.  The Patient Intake Forms always remain a part of each patient's medical records and are in the possession and control of the Clinic.

**Specific Examples Of Dr. Sinha , As An Owner Of Baber, Personally, Knowingly, And Intentionally Self-Referring Patients, As An Owner Of Baber, To The Clinic Where She Was Also Simultaneously An Owner, Resulting In The Submission Of False Claims By Dr. Sinha, Young, And The Clinic To Medicare For Those Very Unlawfully Referred Patients**

46.      For example, Dr. Sinha, Dr. Young, and the Clinic caused to be submitted to Medicare a claim for services performed at the Clinic for a patient who was referred to the Clinic

11

by Baber (through Dr. Sinha). Thus, the Clinic's Patient Intake Form recorded the fact that

Patient "J.13." was first referred to the Clinic by Dr. Sinha, as an owner of Baber, to the Clinic,

where Dr. Sinha was also simultaneously an owner. *See* Exhibit 1, attached hereto (the Clinic's

Patient Intake Form for patient "J.B." which the receptionist at the Clinic filled out in the

ordinary course of business, memorializing the fact that Dr. Sinha herself, as an owner of Baber,

actually referred that particular patient to the Clinic, where Dr. Sinha was also an owner. *See*

*also* Exhibit 2, attached hereto (Patient "J.B.'s" Intake Form, created in the ordinary course of

business in connection with that particular patient's first appointment at the Clinic, which also

memorializes the fact that Dr. Sinha, as an owner of Baber, referred that same patient ("J.B.") to

the Clinic, where Dr. Sinha was also an owner). Moreover, the electronic patient notes and

handwritten psychiatric evaluation notes, which Dr. Sinha herself created in the ordinary course

of business and in connection with the treatment of that same patient ("J.B.") at Baber (and as an

owner of Baber) further corroborate Dr. Sinha's own self-referral of that patient to the Clinic

(where Dr. Sinha was also then an owner). *See also* Exhibit 3, attached hereto. Relator has

personal knowledge, based upon her review of the Clinic's actual billing records, created and

maintained in the ordinary course of business by the Clinic, that a claim for that very same

patient's ("J.B.") evaluation, which was performed at the Clinic, was submitted by the Clinic to

Medicare for reimbursement.

     47. Dr. Sinha had personal knowledge of each and every claim that the Clinic

submitted to Medicare for reimbursement. In addition, she possessed, had access to,

communicated about, and regularly reviewed the Clinic's business records, created and

maintained in the ordinary course of business, that demonstrated each and every Medicare

claimed submitted by the Clinic for payment, as well as the amount of payment that the Clinic received in response.

48.     This is but one example of the hundreds of other instances, documented in the records created and maintained in the ordinary course of business by the Clinic, Dr. Sinha, and Baber, proving that Dr. Sinha, as an owner of Baber, herself referred patients who she had just seen at Baber, to the Clinic, where Dr. Sinha was also simultaneously an owner.  The documents reflecting each such additional instance of this self-referral scheme perpetrated personally by Dr. Sinha, as an owner of Baber -- and thus also for liability purposes by Baber with whom Dr. Sinha was acting on behalf of -- are within the exclusive possession and control of the Defendant Clinic, Defendant Sinha, and Defendant Baber.

49.     In each of those additional instances where the patients were covered under Medicare, Dr. Sinha and the Clinic knowingly submitted claims to Medicare for payment, and received payment, for those patients who had been improperly self-referred in the first instance by Dr. Sinha, as an owner of and acting for Baber, to the Clinic, where Dr. Sinha was also and owner and acting for its interests.

50.     As noted above, in each and every such additional instance with respect to Medicare patients, Dr. Sinha had personal knowledge of each and every claim that the Clinic submitted to Medicare for reimbursement.  In addition, she possessed, had access to, communicated about, and regularly reviewed the Clinic's business records, created and maintained in the ordinary course of business, that demonstrated each and every Medicare claimed submitted by the Clinic for payment, as well as the amount of payment that the Clinic received in response.

51.     In sum, Dr. Sinha, as an owner and representative of both Baber and the Clinic for

purposes of this self-referral scheme knew about, designed, and carried out all aspects of this fraudulent scheme.

52.     Accordingly, because Dr. Sinha was acting for and as a representative of, both the Clinic and Baber, Dr. Sinha, the Clinic, and Baber all have FCA liability arising out of the above-described self-referral scheme.

**B.     Improperly Billed For Duplicative And Unnecessary Medical Procedures**

**1.     Relevant Regulations**

52.     Medicare only reimburses for procedures that are medically necessary. Specifically, "no payment may be made under [Medicare] part A or part B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." *See* §1862(a)(1)(A).

**2.     The Submission Of Claims For Duplicative Evaluations**

53.     Dr. Sinha and Young, and thus the Clinic, on whose behalf they were acting for, regularly systematically, knowingly, and intentionally engaged in duplicative and unnecessary evaluations of patients at the Clinic on a regular and continuous basis.

54.     Specifically, Dr. Sinha, Young, and the Clinic, as a regular part of their standard business practices, intentionally performed multiple evaluations of the very same patients (billed under CPT code 90801) for "psychiatric diagnostic interview examination." Those evaluations were knowingly and intentionally performed by both Dr. Sinha and Young even though they knew that such evaluations should have only been performed once for each patient and were only necessary to be performed once. Dr. Sinha and Young knowingly and intentionally engaged in this fraud to make more money for themselves and the Clinic.

55.     These duplicative evaluations were worthless and misleading and may have caused harm to the mental health patient who were required to undergo potentially painful and probing examinations twice over in order to satisfy the billing and profit motives of Dr. Sinha and Young, and the Clinic which they worked for (and which Dr. Sinha owned).

### 3.     Specific Examples Of Intentionally Fraudulent And Duplicative Evaluations

56.     In the course of her employment at the Clinic, Relator had and gained direct and first-hand personal knowledge that Dr. Sinha and Young (and the Clinic under whom they worked for, represented and under which they billed) regularly caused to be submitted claims for payment to Medicare for psychological evaluations that were duplicative and unnecessary. Those evaluations were regularly, knowingly, and intentionally billed by Dr. Sinha, Young, and the Clinic under CPT Code 90801.

57.     The specific instances of such duplicative procedures can be readily determined by documents and records that were created and maintained in the ordinary course of business at the Clinic, including by Dr. Sinha and Young.

58.     The Clinic's Medisoft billing software permitted the generating of Procedure Day Sheets ("PDSs").  PDSs are records that -- for both Dr. Sinha and Dr. Young – listed, *inter alia*, their own patients and each procedure billed for those patients by them (and thus by the Clinic). Comparing PDSs for Dr. Sinha and Dr. Young, filtered to show only those instances where each doctor billed under CPT Code 90801, it can be readily determined who performed the evaluation and when it was performed.  These PDSs clearly demonstrate that the same CPT Code 90801 for numerous patients was billed in close succession as part of this scheme carried out personally by Dr. Sinha and Young (and thus by the Clinic for whom they worked and represented and where Dr. Sinha was an owner).  Attached hereto as Group Exhibit 5 are some of Dr. Young and Dr.

Sinha's PDSs indicating instances where they (and thus the Clinic) personally billed for CPT

Code 90801 during the time period from January 1, 2010 through May 21, 2012, along with a

spreadsheet based upon those same PDSs that identifies specific instances where Dr. Sinha and

Young (and thus the Clinic) billed Medicare for duplicative patient evaluations during that same

time period.

59.     In addition, handwritten evaluation notes, created and maintained by Dr. Sinha

and Young (and thus the Clinic for whom they worked for and represented and where Dr. Sinha

was an owner) on the same evaluation forms, further corroborate that the patients were

intentionally seen twice by Dr. Sinha and Young (and thus the Clinic) for the very same

evaluation procedures.  Patient health insurance cards, Intake Forms, and Medisoft generated

Patient Account Ledgers ("PALs") (which show any charges and payments made on a patient's

account) demonstrate that Medicare and private insurers were in fact billed twice for the same

procedure.  Group Exhibits 6-8, consisting of these types of documents, created and maintained

in the ordinary course of business by Dr. Sinha and Young (and thus by and for the Clinic) for

Patients "L.K.," "A.H.," and "S.S.," are attached hereto.

60.     Similar records, created and maintained in the ordinary course of business by Dr.

Sinha and Young, identifying and corroborating the numerous other instances where Dr. Sinha

and Young (and thus the Clinic for whom they worked and where Dr. Sinha was an owner)

likewise made claims fraudulent claims to Medicare for unnecessary and duplicative evaluations

are in the exclusive possession and control of the Defendants.

61.     At all relevant times, Dr. Sinha and Young (and thus the Clinic for whom they

worked and where Dr. Sinha was an owner) had specific knowledge of these illegal, fraudulent

and improper acts and practice, including because both Dr. Sinha and Young specifically and

intentionally directed their patients to each other to undergo the duplicative evaluations so that they and the Clinic could make more money.

### C. Dr. Sinha's, Young's, And The Clinic's Improper Billing For Services That They Knew They Had Not Provided At All

62. As set forth below, Dr. Sinha and Young (and thus the Clinic for whom they worked and where Dr. Sinha was an owner) as a matter of practice, policy and procedure, routinely billed Medicare for services that they knew they had not provided to patients at all. Specifically, under this scheme, Dr. Sinha and Young (and thus the Clinic) falsely claimed to have performed "biofeedback" procedures that were not covered by Medicare -- and which they personally knew were not covered by Medicare -- and then falsely and fraudulent billed those procedures to Medicare as if they actually constituted covered psychotherapy services.

### 1. Relevant Medicare Regulations

### a. Psychotherapy Services

63. Medicare provides for the reimbursement of psychotherapy services, including "insight oriented, behavior modifying and/or supportive psychotherapy" and "interactive psychotherapy." *See* 42 U.S.C. 1395w-4. Such products and services include those coded under CPT 90804, 90806, 90810, and 90814.

64. CPT code 90804 describes the following services and products: "[i]ndividual psychotherapy, insight oriented, behavior modifying and/or supportive, in an office or outpatient facility, approximately 20 to 30 minutes face-to-face with the patient."

65. CPT code 90806 provides for the following services and products: "[i]ndividual psychotherapy, insight oriented, behavior modifying and/or supportive, in an office or outpatient facility, approximately 45 to 50 minutes face-to-face with the patient."

66.     CPT code 90810 provides for the following services and products: "[i]ndividual psychotherapy, interactive, using play equipment, physical devices, language interpreter, or other mechanisms of non-verbal communication, in an office or outpatient facility, approximately 20 to 30 minutes face-to-face with the patient."

67.     CPT code 90814 provides for the following services and products: "[i]ndividual psychotherapy, interactive play equipment, physical devices, language interpreter, or other mechanisms of non-verbal communication, in an office or outpatient facility, approximately 75 to 80 minutes face-to-face-time with the patient."

**b.     Neurofeedback or Biofeedback Services**

68.     At all relevant times, the Clinic sometimes performed neurofeedback services, also referred to as "biofeedback services" which are coded under CPT codes 90901 to 90911.

69.     C PT code 90901 describes: "Biofeedback training by any modality."

70.     C PT code 90911 describes: "Biofeedback training, perineal muscles, anorectal or urethral sphincter, including EMG and/or manometry."

71.     Biofeedback is *not* covered by Medicare except under very limited circumstances. Namely, "only when it is reasonable and necessary for the individual patient for muscle re-education of specific muscle groups or for treating pathological muscle abnormalities of spasticity, incapacitating muscle spasm, or weakness' and more conventional treatments have not been successful." *See* Centers for Medicare and Medicaid Services, Medicare Coverage Issues Manual: Transmittal 138.  Biofeedback is *not* covered by Medicare for treatment of "ordinary muscle tension states or for psychosomatic conditions."  *See* Centers for Medicare and Medicaid National Coverage Determinations publication 100-03, chapter 1, part 1, section 30.1.

2.    **Dr. Sinha, Young, And The Clinic Created False Records and Submitted False Claims**

72.    At all relevant times, pursuant to the established practices, policies, and procedures of the Clinic, as set by and of which Dr. Sinha and Young were fully aware, the Clinic's office staff created and maintained in the ordinary course of business a daily Appointment Schedule that identified all of the patient appointments for each day -- for each and every person, doctor or otherwise including Dr. Sinha and Young.  The patient appointments on those documents were color-coded based with the procedure to be performed with that patient on that day, and those procedures were in fact performed on those patients on those days by the individual listed on those Appointment Schedules.  Relator had access to such schedules and possesses copies of them.

73.    At all relevant times, Dr. Sinha and Young had personal knowledge of those Appointment Schedules, were advised of and knew of those Appointment Schedules, and monitored the adherence to those schedules by them and the others listed on them.

74.    At all relevant times, as a matter of office practice, policy and procedure, on a daily basis Dr. Sinha, Young, the interns at the Clinic, and the other Clinic staff members who actually saw patients at the Clinic received "Day Sheets" in the ordinary course of business that had a schedule of their patient appointments for that particular day.  Those Day Sheets listed the name of the patient, the time of his/her appointment, the length of his/her appointment, along with the patient's phone number, and any notes pertaining to the patient's visit.

75.    At all relevant times, Dr. Sinha and Young had personal knowledge of those Day Sheets, were advised of and knew of those Day Sheets, and monitored the adherence to those Day Sheets by them and the others listed on them.

76.     At all relevant times and pursuant to the established policies, practices, and procedures of the Clinic, after seeing each patient, Dr. Sinha, Young, the interns, and the other Clinic staff members were required to record, and recorded, the CPT code under which the patient should be billed to Medicare (as opposed to the CPT code of the procedure that was actually performed).

77.     At all relevant times and pursuant to the established policies, practices, and procedures of the Clinic, Dr. Sinha, Young, the interns, and the other members of the Clinic, were required to sign, and signed, their initials on the patient's row on those Day Sheets.

78.     In each instance where Dr. Sinha and Young provided what were actually non-covered neurofeedback services to Medicare, they misrepresented, and also instructed the interns and Clinic office staff to misrepresent, that the services that were actually rendered by them instead constituted "covered" psychotherapy services, by entering one of the covered psychotherapy CPT codes into the Day Sheets -- as opposed to the CPT codes for the neurofeedback procedure that was actually performed.

79.     Dr. Sinha and Young did this themselves, and instructed the other members of the Clinic to do so, in order to get otherwise non-covered and non-reimburseable claims paid by Medicare.

80.     Specifically, Dr. Sinha and Young themselves entered, and trained all Clinic interns and office staff to enter, the following specific and false CPT codes onto the Day Sheets records used by the Clinic and its staff to create fraudulent billing submissions to Medicare:

a. For otherwise non-covered thirty minute neurofeedback consultations, Dr. Sinha and Young entered, and trained the other Clinic members to enter, CPT code 90804 -- which was the code for Medicare *covered* 20-30 minute individual psychotherapy, insight oriented, behavior modifying and/or supportive;

b. For otherwise non-covered biofeedback therapy, Dr. Sinha and Young entered, and trained the other Clinic members to enter, CPT code 90806 -- which was the code for Medicare *covered* 45-50 minute individual psychotherapy; and for thirty minute neurofeedback sessions, Dr. Sinha and Young entered, and trained the other Clinic members to enter, CPT code 90810 -- which was the code for Medicare *covered* 20-30 minute individual psychotherapy, interactive, using play equipment, physical devices, language interpreter, or other mechanisms of non-verbal communication; and

c. For otherwise non-covered sixty minute neurofeedback sessions, Dr. Sinha and Young entered, and trained the other Clinic members to enter, CPT code 90814 -- which was the code for Medicare *covered* 75-80 minute individual psychotherapy.

81.     Thus, at all relevant times and in the ordinary course of business, at the end of the work day, Dr. Sinha and Young, and the other Clinic members who saw patients, provided the completed Day Sheets to the Clinic's receptionist, who in turn entered the fraudulent "covered" CPT code charges into the Clinic's Medisoft electronic medical records system so that Medicare could be fraudulent billed and so that Dr. Sinha and Young (and the Clinic) could earn more money.  Those Medisoft entries were then used to generate the actual claims in the RelayHealth

21

billing system (the Clinic's authorized billing agent) for Medicare and they were submitted to Medicare.

82.    Dr. Sinha and Young also trained Clinic receptionists and the Relators to further alter entries that had already been made on the Day Sheets when billing Medicare in the Medisoft billing system as follows:

a.    From CPT Code 90814 (the code for 75-80 minute individual therapy), to CPT Code 90806 (the code for 45-50 minute individual therapy);

b.    From CPT Code 90810 (the code for 20-30 minute individual psychotherapy, interactive, using play equipment, physical devices, language interpreter, or other mechanisms of non-verbal communication) to CPT code 90804 (the code for 20-30 minute individual psychotherapy, insight oriented, behavior modifying and/or supportive).

83.    In the ordinary course of business and as part of her duties as Office Manager for the Clinic, and pursuant to the specific instructions of Dr. Sinha and Young, the Relator was required to finalize, and finalized, the above-referenced improper claims for submission to RelayHealth (which in turn transmitted those claims to Medicare).

84.    As Office Manager, the Relator was able to access all Clinic files, including the schedules, Day Sheets, and patient files.

85.    Thus, in the ordinary course of business and pursuant to Dr. Sinha's and Young's instructions, the Relator finalized and submitted claims for allegedly covered psychotherapy services where the patients had in fact received *non-covered* neurofeedback services or no services at all.

86.     The Relator, as Office Manager, had personal and direct knowledge that the claims submitted to Medicare that contained allegedly covered CPT codes were in fact for procedures performed by Dr. Sinha and Young for non-covered procedures, and were actually billed to and paid by Medicare.

87.     Specifically, the Realtor personally reviewed and observed insurance Explanation of Benefits ("EOBs"), which are statements sent from insurance companies to healthcare providers identifying the specific medical treatment and/or services that were claimed and paid. Relator also personally reviewed and observed Medisoft generated Patient Account Ledgers ("PALs"), which identified any charges and payments made related to each Clinic patient, as well as Medisoft generated Payment/Procedure Day Sheets ("PDSs"), which identified any charges or payments that were made for Dr. Sinha and Young on any given day or under any given CPT code.  Examples of those documents are submitted herewith in connection with other documents corroborating the false claims.

88.     With respect to all of the fraudulent activities set forth Paragraphs 72 through 87 above, Dr. Sinha and Young designed, and carried out all of them.

**3.      Examples Of Specific False Records And Claims For Dr. Sinha, Young, And The Clinic**

89.     In the course of the Relator's employment at the Clinic, on thousands of occasions Dr. Sinha and Young caused to be submitted claims for procedures categorized under the covered psychotherapy CPT codes 90804, 90806, 90810, and 90814, in circumstances where they personally knew that they had, or the other Clinic member had, actually provided non-covered neurofeedback services (CPT code 90901).

90.     Each of the instances where the Clinic billed Medicare for these non-covered neurofeedback as allegedly *covered* psychotherapy can be identified from the records maintained

in the ordinary course of business and in the exclusive possession and control of Dr. Sinha, Young, and the Clinic.

91.     Specifically, the daily Appointment Schedules for the Clinic, along with the office-legend for color-coding patient appointments on the Appointment Schedule, identify the instances where a patient was actually scheduled for and received neurofeedback services at the Clinic.  In addition, the handwritten patient notes for each patient created and maintained by Dr. Sinha, Young, and the other Clinic members who saw patients, further corroborate the instances where the patients actually underwent neurofeedback sessions ("NFB session").

92.     In instances where the patient actually received neurofeedback services at the Clinic as stated in the above described records, the corresponding Day Sheets for the intern or office staff member who actually performed the non-covered neurofeedback procedures state one of CPT code 90804, 90806, 90810, or 90814 (CPT codes for covered psychotherapy) next to the patient's name.  Such notations served as an instruction to the office staff, including the Relator, to bill Medicare that neurofeedback procedure under one of those covered psychotherapy codes.

93.     Insurance E.O.B.'s and Medisoft generated PALs and PDSs corroborate that Medicare was billed by Dr. Sinha, Young, and the Clinic, and that Medicare actually made payments for purportedly covered psychotherapy services, when in fact no such procedure was ever even performed by Dr. Sinha, Young, and the Clinic.

94.     Attached hereto as Group Exhibits 10-13, are representative examples for Clinic patients "R.R.," "D.S.," "B.W.," and "R.K.," of the above described documents identifying instances where Dr. Sinha, Young, and Clinic falsely billed for what were supposed to be non-covered services as *covered* psychotherapy services.

95.     Similar records proving the other instances where the Dr. Sinha, Young, and the Clinic falsely claimed and billed to Medicare that covered psychotherapy services had been rendered when in fact non-covered neurofeedback services had actually been provided are in the exclusive possession and control of the Defendants.

96.     Dr. Sinha, Young, and the Clinic, themselves possessed specific knowledge of these illegal, fraudulent, and improper Medicare practices.  Indeed, Dr. Sinha and Young instructed and trained the Relator to submit claims to Medicare for allegedly *covered* psychotherapy services when they actually knew that non-covered neurofeedback had in fact been performed.

### C.     Dr. Sinha, Young, And The Clinic Intentionally And Improperly Billed Medicare For Psychological Testing That They Did Not Actually Perform

97.     Psychological testing is identified by CPT code 96118 which specifically applies to the following services: "[n]europsychological testing[,] per hour of the psychologist's or physician's time, both face-to-face time administering tests to the patients and time interpreting these test results and preparing a report."

98.     At all relevant times, Psychological testing was billable to Medicare as "units," or specific tests performed.

99.     A test "battery" is a series of specific tests which is supposed to be tailored to the mental health patient's needs depending on their age and other factors.

100.    Medicare covers a maximum of 9 units of testing.

101.    When billing for psychological testing under CPT code 96118, the Clinic's Medisoft system prompted the entry of the number of units of testing which had been purportedly performed.  As a matter of actual office practice, policy, and procedure, and at the specific instruction of Dr. Sinha and Young, all of the Clinic's office staff (including the Relator)

were directed to enter the *maximum* amount of reimbursable units of testing into Medisoft regardless of the number of units of testing that had been actually performed.

102.    By way of representative example, attached hereto as Exhibit 14 is a document that was created and maintained in the ordinary course of business by the Clinic.  It lists the specific tests that may be administered to mental health patients at the Clinic.

103.    By way of representative example, attached hereto as Exhibit 15 is a document that was created and maintained in the ordinary course of business by the Clinic.  It was posted in the administrative area for receptionists and the Relator to observe and follow – and they were required to do so.

104.    Exhibit 15 identified various CPT codes, their service description, and the price that Dr. Sinha and Young charged for each service corresponding to each code.

105.    Exhibit 15 also contains handwritten notes created by Young that provided instructions to the Clinic's receptionists and the Relator that they should bill Medicare for the *maximum* units of testing covered by Medicare, regardless of the amount of testing units that had been actually performed by Dr. Sinha, Young, the Clinic interns, and others.

106.    Specifically, Young's notes instructed that 9 units should be billed for a "neuropsych battery" for "medicare only," and that 20 units should be billed for a "neuropsych battery" for "all insurance except Medicare."

107.    Records of specific examples of instances where Dr. Sinha, Young, and the Clinic billed for the maximum amount of testing when in fact less than that had been actually performed are in the exclusive possession and control of the Defendants.

108.    Dr. Sinha and Young possessed specific knowledge of these illegal, fraudulent, and improper Medicare practices.

109.     Indeed, Dr. Sinha and Young personally instructed and trained the Relator and the Clinic's office staff to submit claims for payment to Medicare for the maximum units of testing knowing full well that such units had not actually been performed.

**D.     Dr. Sinha, Young, And The Clinic Improperly Billed Medicare For Tests And Services That Were Performed By Unsupervised Student Interns**

**1.     Relevant Medicare Regulations**

110.     At all relevant times, in order to qualify as a clinical psychologist under Medicare, a practitioner must both:

> Hold a doctoral degree in psychology; [and b]e licensed or certified, on the basis of the doctoral degree in psychology, by the State in which he or she practices, at the independent practice level of psychology to furnish diagnostic, assessment, preventive, and therapeutic services directly to individuals

*See* Centers for Medicare and Medicaid Services, Medicare Benefit Policy Manual (Rev. 158, June 8, 2012), Chap. 15, Sec. 160.

111.     At all relevant times, Medicare only covered and paid for psychological and neuropsychological services that had been performed by an intern, rather than a clinical psychologist or physician, *if* the requisite amount of supervision from a physician or other licensed professional has been first met.

112.     In fact, at all relevant times, the Medicare Benefit Policy Manual specifically stated that "[u]nder the physician fee schedule, there is no payment for services performed by students or trainees." *Id.* at Sec. 80.2.

113.     More specifically, at all relevant times, tests performed by interns were only covered if a "clinical psychologist ("CP") or a physician … perform the general supervision assigned to diagnostic psychological and neuropsychological tests." *Id.*

114.     Moreover, at all relevant times, services that had been performed by an intern that were "incident to" a clinical psychologist's services were covered only if these services are "[p]erformed under the direct supervision of a [clinical psychologist]; *e.g.,* the [clinical psychologist] must be physically present and immediately available."

2.     **Dr. Sinha, Young, And The Clinic Intentionally Failed To Comply With Regulations Regarding Supervision Of Interns In A Reckless And Dangerous Attempt To Make More Money**

115.     At all relevant times, the Clinic regularly utilized student interns from, *inter alia,* the Adler School of Professional Psychology and the Chicago School of Professional Psychology to work in the Clinic.  Those interns received school credit for their work.

116.      At all relevant times, none of the student interns working at the Clinic held a doctoral degree in psychology, nor were any of them licensed by the State of Illinois or any other State to furnish diagnostic, assessment, preventive, and therapeutic services directly to individuals as required by Medicare – and common sense.

117.     At all relevant times, each new patient at the Clinic received at least one evaluation (as described above, many receive duplicative evaluations), including but not limited to from Dr. Sinha and Young.  Based upon that evaluation, the Clinic's patients typically subsequently undergo: (1) psychological testing, (2) therapy, and/or (3) a quantitative electroencephalograph (QEEG) followed by neurofeedback sessions.

118.     At all relevant times and as stated above, Medicare only provided reimbursement for such procedures if they were provided by licensed practitioners.  Non-licensed practitioners and interns could only perform such procedures under the supervision of a licensed provider.

119.     At all relevant times, the Clinic's student interns performed all of the above procedures in every step of the entire patient experience process (with the exception of the

QEEG). As a matter of the practices, policies, and procedure created and designed by, carried

out by, and supervised by Dr. Sinha and Young, the interns performed the procedures described

above without the supervision of either Dr. Sinha and Young.

120. In fact, at all relevant times, Dr. Sinha made it her practice not to even be present

at all on most days that the Clinic was operational. Instead, Dr. Sinha was working elsewhere,

i.e., at Baber or otherwise.

121. This arrangement allowed Dr. Sinha to run more than one office at once and make

more money.

122. Thus, Dr. Sinha was well aware, including by way of, *inter alia*, her review and

knowledge of the schedules, documents created by the interns, and billing records, that the

interns were seeing full schedules of patients without any supervision from her or from anyone

else.

123. This arrangement also severely compromised patient care and safety.

124. In fact, on Saturdays, the Clinic generally was run by interns exclusively.

125. Young was no less absent from the operations of the Clinic.

126. While at the Clinic, Young saw her own full load of patients, while the interns did

the same and without any supervision by Young.

127. In fact, Young was often only able to see interns if they came over to her house,

and was sometimes gone from the Clinic entirely for long stretches of time without explanation.

128. Incredibly, Dr. Sinha and Young ever hired, paid, allowed to work at the Clinic,

and to see patients, an individual who merely had a high school diploma and who was, by no

stretch of the imagination, an intern.

129.   Moreover, Dr. Sinha and Young in turn billed Medicare for the purported "services" that were provided by the intern or other, but as if they (Dr. Sinha or Young) had actually performed those services instead of the intern or other.

130.   In sum, the reckless, money-making practices of Dr. Sinha and Young were potentially dangerous to the health of the patients at the Clinic and were in direct violation of Medicare policy – and common sense.

### 3.   Specific Examples Of Interns Working Without At The Clinic Without Supervision From Dr. Sinha, Young, Or Anyone Else

131.   In the regular course of her employment at the Clinic and on hundreds of occasions, pursuant to the policies, instructions and directions of Dr. Sinha and Young, the Realtor caused to be submitted claims for services provided by interns without the requisite supervision (or any supervision) from Dr. Sinha, Young, or anyone else.

132.   It can be determined by the records in the possession and control of Dr. Sinha, Young, and the Clinic all of the particular patients who were actually seen and "treated" by interns without any supervision at all from Dr. Sinha, Young, or anyone else – let alone from a licensed provider.

133.   However, attached hereto as Exhibit 22, is a list of dozens of representative examples where interns, or less than interns, saw and purportedly "treated" patients at the Clinic without any supervision at all from Dr. Sinha, Young, or anyone else – let alone from a licensed provider.

134.   Indeed, as noted above, on some occasions, neither Dr. Sinha nor Young were even in the Clinic at the time.

135.    Exhibit 22 provides the initials of the patient who was seen by an intern or other at the Clinic; the date(s) of such purported "treatment;" the name of the doctor (i.e., Dr. Sinha or Young) who Dr. Sinha, Young, and the Clinic used to bill Medicare on those occasions.

136.    On each and every one of the separate occasions (lines) listed in Exhibit 22, Dr. Sinha, Young, and the Clinic intentionally and falsely billed Medicare and received payment from it, as if Dr. Sinha or Young had actually seen those patients.

137.    With respect to all of the entries for "Crystal" in Exhibit 22, those likewise represent instances where Medicare was similarly falsely billed by Dr. Sinha, Young, and the Clinic by Crystal, who was not an intern at all; who was merely a high school graduate; but who nonetheless saw and "treated" the patients

138.    Crystal Norton (maiden name Crystal Baril) is the Crystal who appears in Exhibit 22.

139.    Furthermore, the Clinic's Appointment Schedules, along with the office-legend for color coding patient appointments, indicated when a patient was scheduled to see an intern for an evaluation.  The intern's Day Sheet, which contained their initials along with an entry of "90801" next to the patient's name, further corroborates when an intern performed a diagnostic interview evaluation on a patient.

140.    The daily Appointment Schedules for the Clinic indicated which days neither Dr. Sinha nor Young were not even present in the Clinic, either because they were not scheduled for any patient appointments or because the schedule indicates "Nh," which stands for "no hours" or "vacation" underneath their name.  The Clinic nonetheless fraudulently billed Medicare for procedures performed on those days under Dr. Sinha or Young, even though the interns and others seeing patients were not supervised by anyone.

141.    The PALs, created and maintained by Dr. Sinha, Young, and the Clinic further corroborate the fact that, despite the lack of requisite supervision of these interns and others, the Clinic billed for these procedures under the Defendant Physicians' NPI numbers, as indicated by the initials "SS" for Shoba Sinha or "SY" for Sabrina Young under the column titled, "Provider."

142.    Attached hereto as Group Exhibit 16-19, are examples of the above described documents which identify claims submitted for procedures performed on Patients "L.M.," " K. M.," and "E.N." by unsupervised interns or others.

143.    Similar records identifying all other specific instances where Dr. Sinha, Young, and the Clinic billed Medicare for services performed by student interns and others without the supervision of a licensed professional or any supervision at all are in the exclusive possession and control of the Defendants.

144.    In sum, at all relevant times, Dr. Sinha, Young, and the Clinic possessed specific knowledge of these illegal, fraudulent, and improper Medicare practices.

145.    In fact, when the Relator expressed a concern that students and others were performing procedures at the Clinic while neither Dr. Sinha nor Young were present to supervise them, Dr. Young responded via e-mail, stating, "[s]o you are clear, all of my students work under me and can work without me being physically present as they are all supervised by me." *See* Ex. 20 attached hereto, a true and correct copy of an April 21, 2010 D. Rake e-mail.

146.    Also attached hereto as Exhibit 21 is a true and correct copy of an e-mail dated May 9, 2012 from an office receptionist to the interns at the Clinic, stating that "Dr. Young will be out and won't return until May 30th.  If you need to reach her, she is available next May 14th-May 18th.  Starting May 19th she will no longer be in the states."

32

147.    Of course, even though Young was the only one during that time period even pretending to be "supervising" the interns and others at the Clinic, those interns and others continued to perform (and bill Medicare for) procedures under Dr. Sinha's and/or Young's name without any supervision from Young or anyone else.

148.    Dr. Sinha knew full well that Young was not even around, but still allowed, encouraged, and billed and collected from Medicare for the "work" done by the interns and others without any supervision at all.

### E.    Dr. Sinha, Young, And The Clinic Improperly Billed For Services That Were Not Performed By A Doctor Or Licensed Professional

### 1. Relevant Regulations

149.    At all relevant times, Medicare Part B provided coverage for psychotherapy services provided only by "doctors or other licensed professionals allowed by the state to give these services." *See* Centers for Medicare and Medicaid Services, Medicare And Your Mental Health Benefits, available at http://www.medicare.gov/publications/pubs/pdf/10184.pdf.

150.    At all relevant times, the Illinois Psychologist Licensing Act provided that "[n]o individual without a valid license as a clinical psychologist issued by the Department, in any manner hold himself out to the public as a psychologist or clinical psychologist … or render … clinical psychological services." *See* 225 ILCS 15/1.

151.    At all relevant times, those clinical psychological services included both "therapy" and "biofeedback." *See* 225 ILCS 15/2(5).

152.    Furthermore, at all relevant times and pursuant to the Medicare Benefit Policy Manual, only clinical psychologists, nurse practitioners, clinical nurse specialists, physician assistants, independently practicing psychologists, physical therapists, occupational therapists, and speech-language pathologists were allowed to bill for some or all, diagnostic psychological

33

and neuropsychological tests.  *See* Centers for Medicare and Medicaid Services, Medicare

Benefit Policy Manual, CMS Pub. 100- 02, Chap. 15 Sec. 80.2.

> **2.      Dr. Sinha, Young, And The Clinic Submitted False Claims As A Result Of Their Failure To Comply With Regulations On Licensing**

153.    At all relevant times and pursuant to the standard practices, policies, and

procedures of the Clinic, staff members Crystal Norton (maiden name Crystal Baril) ("Crystal")

and Erik Hejnosz ("Erik") purported to render clinical psychological services to patients even

though they did not have any qualifications or training to do so.

154.    Dr. Sinha and Young hired them, "trained" them, fraudulently billed Medicare for

their "services," and were well aware of the work they were purporting to perform with and on

the Clinic's patients.

155.    Dr. Sinha, Young, and the Clinic improperly billed such bogus "services"

provided by Crystal and Erik to Medicare.

156.    As indicated above, at all relevant times, each new patient at the Clinic underwent

at least one (but often duplicative) evaluations.  Based upon the results of the evaluation, Dr.

Sinha or Young prescribed that the patient undergo: (1) psychological testing, (2) therapy, and/or

(3) a quantitative electroencephalograph (QEEG) followed by neurofeedback sessions.

157.    At all relevant times, CPT codes 95961 and 95962 represented the services for a

QEEG report.  The former CPT was the code for the QEEG procedure, and the latter was for the

QEEG interpretation.

158.    At all relevant times, those procedures were *not* covered by Medicare.

159.    At all relevant times and in the ordinary course of business, and pursuant to the

training and instructions of Dr. Sinha and Young, the non-licensed and wholly unqualified

individuals, Crystal and Erik, "performed" QEEG procedures on patients, conducted the interpretations of these QEEGs, and drafted reports.

160.    QEEGs are a clinical psychological services and a license was required to perform such services.

161.    At all relevant times, neither Crystal nor Erik were licensed clinical psychologists and therefore could not perform those services individually on a patient.

162.    At all relevant times and in the ordinary course of business, and pursuant to the instructions of Dr. Sinha and Young, the Relator caused to be submitted claims to private insurers for the services rendered by Crystal and Erik under the Defendant Physicians' NPI numbers for both the QEEG procedure and interpretation.

163.    As a result, the submitted claims falsely described and stated that services had been provided and rendered by one of the Defendant Physicians, when in fact the services had actually been rendered by the unlicensed and unqualified Crystal or Erik.

> **F.    Dr. Sinha, Young, And The Clinic Improperly Billed Under Their Own NPI Numbers for Services That They Did Not Perform**

164.    At all relevant times and on a regular and systematic basis, Dr. Sinha, Young, and the Clinic also billed for test interpretations under Young's NPI number that were *not* performed by Young.

165.    As stated previously, at all relevant times reimbursement for services billed under CPT code 96118 included time spent by the provider "interpreting test results and preparing a report."

166.    At all relevant times, the American Psychological Association Practice Organization indicated that CPT code 96118 was to be used where the psychologist or neuropsychologist did not employ other technicians or computerized testing procedures to

complete the tests and report. *See* New Medicare Billing Rules for Testing Services, effective 10/1/2006, available at http://napnet.org/NCCI-CMS- Testing-Alert.pdf.

167.    At all relevant times, CPT code 96118 was to only to be used when billing for that specific neuropsychologist's time. *Id.*

168.    At all relevant times and on a regular basis, Young did not herself interpret and report her test results as was required by Medicare for reimbursement.

169.    Rather, Young outsourced that functions to Paul Danaan, an intern at the Clinic, and Dr. Yeager, who was not affiliated with the Clinic at all, to interpret and report for her.

170.    Thus, on many occasions, Mr. Danaan and Dr. Yeager interpreted test results, prepared reports, and provided the completed reports back to Dr. Young.

171.    At all relevant times and as a matter of the Clinic's office practice, policies, and procedure, and pursuant to the instructions of Dr. Sinha and Young, the Relator billed Medicare for those interpretation and reporting services, that had actually been conducted by Mr. Danaan and Dr. Yeager, under Young's NPI number and as if Young had performed those services.

## **COUNT ONE**
**(Defendants Dr. Sinha, Young, And The Clinic - Violations of the False Claims Act 31 U.S.C. §3729(a)(1)(A))**

172.    The Relator incorporates by reference the allegations of Paragraphs 1 through 171 above as if fully set forth herein as Paragraph 172 of Count One.

173.    In this Count, the Relator seeks relief against all of the Defendants except Baber on behalf of the United States in the form of compensatory damages, treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

174.    As alleged above, each of the Defendants intentionally and knowingly, or acting with deliberate ignorance or with reckless disregard for the truth, presented or caused to be

presented, false or fraudulent claims for payment or approval in connection with submission of medical claims and requests for reimbursement under the Medicare program.

175.    The United States and/or its fiscal intermediary paid Defendants under the Medicare program due to the Defendants' conduct.

176.    As a direct and proximate result of Defendants' illegal and fraudulent conduct as described in detail above, the United States has been damaged in a substantial amount to be determined at trial.

## COUNT TWO
### (Defendants Dr. Sinha, Young, And The Clinic - Violations of the False Claims Act 31 U.S.C. §3729(a)(1)(B))

177.    The Relator incorporates by reference the allegations of Paragraphs 1 through 171 above as if fully set forth herein as Paragraph 177 of Count Two.

178.    In this Count, the Relator seeks relief against each of the Defendants on behalf of the United States in the  form of compensatory damages, treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

179.    As set forth above, each of the Defendants intentionally and knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, made, used and caused to be made and used, false records and statements material to false or fraudulent claims in connection with the submission of false claims for reimbursement under the Medicare Program to get claims paid.

180.    The United States and/or its fiscal intermediaries paid such false or fraudulent claims due to the acts and conduct of Defendants.

181.    As a direct and proximate result of Defendants' illegal and fraudulent conduct, the United States has been damaged in a substantial amount to be determined at trial.

## COUNT THREE
### (All Defendants - Violations of the False Claims Act 31 U.S.C. §3729(a)(1)(C))

182.     The Relator incorporates by reference the allegations of paragraphs 1 through 171 above as if fully set forth herein as Paragraph 182 of Count Three.

183.     As detailed above, each of the Defendants conspired with one another to commit violations of 31 U.S.C. §3729(a)(1)(A) and 31 U.S.C. §3729(a)(1)(A).

184.     Dr. Sinha, Young, and the Clinic agreed with each other to submit false and fraudulent claims and to create false records that indicated that Dr. Sinha and Young had allegedly rendered "psychotherapy services" when in fact such "psychotherapy services" had not actually been rendered.

185.     Baber, along with Dr. Sinha and the Clinic further agreed to engage in self-referral and duplicative evaluations schemes.

186.     Lastly, Dr. Sinha, Young, and the Clinic agreed to illegally bill for services performed by interns that were not properly supervised, and to bill for services performed by office staff that was not licensed to do so under their NPI numbers.

187.     The Relator is aware of that illegal agreement because she was told by Dr. Sinha and Young that the members of the Clinic had decided to create records and submit claims in this fake and fraudulent manner.

188.     As described in this Complaint above, one or more of the Defendants performed acts in furtherance of the above-described agreements to create false records and to submit false claims.

189.    The Relator seeks relief against each of the Defendants on behalf of the United States in the form of compensatory damages, treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

190.    The United States and/or its fiscal intermediaries paid such false or fraudulent claims due to the acts and conduct of Defendants.

191.    As a direct and proximate result of Defendants' illegal and fraudulent conduct, the United States has been damaged in a substantial amount to be determined at trial.

## COUNT FOUR
### (Dr. Sinha, Baber, And The Clinic—Violations of Stark)

192.    The Relator incorporates by reference the allegations of paragraphs 1 through 171 above as if fully set forth herein as Paragraph 192 of Count Four.

193.    In this Count, the Relator seeks relief Defendants Dr. Sinha, Baber, and the Clinic on behalf of the United States in the form of compensatory damages, treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

194.    As set forth above, these three Defendants intentionally and knowingly caused to be presented, false and fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered to patients Defendants Dr. Sinha and Baber unlawfully referred to the Clinic in violation of the Stark Statute.

195.    As a direct and proximate result of these three Defendants' illegal and fraudulent conduct, the United States has been damaged in a substantial amount to be determined at trial.

**RESPECTFULLY SUBMITTED,**

**By:**    <u>**s/Michael I. Leonard**</u>
           **Counsel for Defendant**
           **Mr. Alkahla**

**LEONARDMEYER, LLP**
Michael I. Leonard
Ethan E. White
Maryam Arfeen
203 North LaSalle, Suite 1620
Chicago, Illinois 60601
(312)380-6559 (phone)
(312)264-0671 (fax)
mleonard@leonardmeyerllp.com
October 9, 2015

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 9, 2015, a true and correct copy of the foregoing was caused to be served on all counsel of record, via ECF filing.

**RESPECTFULLY SUBMITTED,**

**By:** **s/Michael I. Leonard**
**Counsel for Defendant**

**LEONARDMEYER, LLP**
Michael I. Leonard
203 North LaSalle, Suite 1620
Chicago, Illinois 60601
(312)380-6559 (phone)
(312)264-0671 (fax)
mleonard@leonardmeyerllp.com